

ENTERED
CLERK, U.S. DISTRICT COURT
MAR 14 2002
3-14-02
CENTRAL DISTRICT OF CALIF.

FILED
CLERK US DISTRICT COURT
FILED
MAR 13 2002
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HARLAN ELLISON, an individual, | CV 00 - 04321 FMC (RCx) |
| Plaintiff(s), | ORDER GRANTING DEFENDANT AOL'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| STEPHEN ROBERTSON, an individual; AMERICA ONLINE, INC., a corporation; REMARQ COMMUNITIES, INC., a corporation; CRITICAL PATH, INC., a corporation; "CITIZEN 513," an individual; and DOES 1 through 10, | |
| Defendant(s). | |

### Introduction

When an overenthusiastic fan uploads his favorite author's novels to a newsgroup on the internet, what is the liability of an internet service provider, such as AOL, for allowing the books to reside for two weeks on their USENET server? The impact of the Digital Millenium Copyright Act on this issue presents a question of first impression in the Ninth Circuit

### I. Procedural Posture

This matter is before the Court on (1) Defendant AOL's Motion for Summary Adjudication, filed June 4, 2001; (2) Defendant AOL's Motion for Summary Judgment, filed November 26, 2001; and (3) Plaintiff's Motion for Summary Adjudication, filed November 27, 2001. This matter came on for

210

1 hearing on February 4, 2002.  The parties were in possession of the Court's
2 tentative decision to grant Summary Judgment to Defendant AOL.  Following
3 oral argument, the matter was taken under submission.  For the reasons set
4 forth below, the Court hereby **GRANTS** summary judgment in favor of AOL.[1]

5

6                                  II. Background

7

8 <u>A. Factual History</u>

9        Plaintiff Harlan Ellison is the author of many works of fact and fiction,
10 particularly science fiction.  He is the owner of the valid copyrights to most
11 if not all of those works and has registered his copyrights in accordance with
12 all applicable laws.  Some of his fictional works, however, have been copied
13 and distributed on the internet without his permission.

14        Some time in late March or early April 2000, Stephen Robertson
15 scanned a number of Ellison's fictional works in order to convert them to
16 digital files.  Thereafter, Robertson uploaded and copied the files onto the
17 USENET newsgroup "alt.binaries.e-book."  Robertson accessed the internet
18 through his local internet services provider, Tehama County Online
19 ("TCO"); his USENET service was provided by RemarQ Communities, Inc.
20 ("RemarQ"). The USENET, an abbreviation of "User Network," is an
21 international collection of organizations and individuals (known as 'peers')
22 whose computers connect to each other and exchange messages posted by

23

24 _____

25        [1]AOL also filed a fourth Motion for summary judgment or adjudication focusing on the
26 extent of damages that would be available to Ellison if he were to prevail on his copyright
27 infringement claims against AOL.  Because the Court grants AOL's Motion for summary judgment
28 on the merits, we need not reach the issue of damages.

USENET users.[2]  Messages are organized into "newsgroups," which are topic-based discussion forums where individuals exchange ideas and information.[3]  Users' messages may contain the users' analyses and opinions, copies of newspaper or magazine articles, and even binary files containing binary copies of musical and literary works.  "Alt.binaries.e-book", the newsgroup at issue in this case, seems to have been used primarily to exchange pirated and unauthorized digital copies of text material, primarily works of fiction by famous authors, including Ellison.

Peers  in USENET enter into peer agreements, whereby one peer's servers automatically transmit and receive newsgroup messages from another peer's servers.  As most peers are parties to a large number of peer agreements, messages posted on one USENET peer's server are quickly transmitted around the world.  The result is a huge informational exchange system whereby millions of users can exchange millions of messages every day.

AOL has been a USENET peer since 1994, and its USENET servers automatically transmit and receive newsgroup messages from at least 41 other peers.  AOL estimates that its peer servers receive 4.5 terabytes of data in more than twenty-four million messages each week from AOL's peers.  This data is automatically transmitted to and received by AOL's USENET servers, which are computers that are accessed by AOL's users when they

_____

[2] Although the USENET is closely affiliated to the internet, the two are distinct.  There is no specific network that is the USENET.  Instead, Usenet traffic flows over a wide range of networks, including the internet.

[3] There are newsgroups devoted to such diverse topics as "science fiction writers" and "New York Mets baseball."

1  reach the USENET system through AOL's newsgroup service.  In late
2  March and early April 2000, when Robertson posted the infringing copies of
3  Ellison's works, AOL's retention policy provided for USENET messages
4  containing binary files to remain on the company's servers for fourteen days.

5      After Robertson  uploaded the infringing copies of Ellison's works to
6  the alt.binaries.e-book newsgroup, they were then forwarded  and copied
7  throughout USENET onto servers all over the world, including those
8  belonging to AOL.  As a result, AOL users had access to the alt.binaries.e-
9  book newsgroup containing the infringing copies of Ellison's works.  As
10 these infringing copies were in binary file form, they would have remained
11 on AOL's servers for approximately fourteen days.

12     On or about April 13, 2000, Plaintiff learned of the infringing activity
13 and contacted counsel.  After researching the notification procedures of 17
14 U.S.C. §512, the Digital Millennium Copyright Act ("DMCA"), Plaintiff's
15 counsel sent an e-mail on April 17, 2000, to TCO's and AOL's agents for
16 notice of copyright infringement.  Plaintiff received an acknowledgment of
17 receipt from TCO, but no response from AOL, which claims never  to have
18 received that e-mail.

19     On April 24, 2000, Plaintiff filed suit against AOL and other
20 Defendants.   After having been served by Plaintiff on April 26, 2000, AOL
21 blocked its users' access to alt.binaries.e-book.

22

23 B. Procedural History

24     On April 24, 2000, Plaintiff filed his original complaint with this
25 Court.  Shortly thereafter, on May 30, 2000, Plaintiff filed a First Amended
26 Complaint.  On June 1, 2000, a consent judgment was entered in which one
27 of the Defendants, Stephen Robertson, agreed to pay Plaintiff the sum of
28 $3,648.96.  Plaintiff in turn dismissed Robertson from the lawsuit.  On July

4

1   27, 2000, the Court issued an Order granting in part and denying in part

2   Defendant AOL's Motion to dismiss.

3          On September 26, 2000, Plaintiff filed a second amended complaint

4   ("SAC") against America Online, Inc. ("AOL"), RemarQ Communities, Inc.

5   (RemarQ), Critical Path, Inc. ("CP") (RemarQ's parent company), Citizen

6   513, and Does on October 27, 2000, alleging the following causes of action:

7          (1) Direct Copyright Infringement against all Defendants;

8          (2) Contributory Infringement against all Defendants;

9          (3) Vicarious Infringement against RemarQ, CP, and AOL;

10         (4) Unfair Competition in Violation of Section 43(a) of the Lanham

11         Act against all Defendants; and

12         (5) Trademark Dilution under Section 43(c) of the Lanham Act against

13         all Defendants except Robertson and AOL.

14         On November 28, 2001, Plaintiff dismissed his Lanham Act claims as

15   against AOL.  On January 18, 2002, Plaintiff dismissed Defendant RemarQ

16   from the case, the two parties having reached a settlement agreement.  And

17   on January 25, 2002, Plaintiff similarly dismissed his action against

18   Defendant Critical Path.

19         On November 26, 2001, AOL filed a Motion for summary judgment,

20   alleging that Plaintiff had failed to set forth prima facie cases of copyright

21   infringement, and also claiming various defenses under the DMCA.  On

22   November 27, 2001, Plaintiff filed his own Motion for summary adjudication

23   of his contributory and vicarious copyright infringement claims against

24   AOL.  This Order addresses all three of those Motions.[4]

25

26   _____

27         [4]Plaintiff claims that AOL's Motion for summary judgment is improper because its

28   arguments regarding its compliance with subsections 512(a) and (i) were raised for the first time in

5

1

2                                    III. Standard

3

4          Summary judgment is proper only where "the pleadings, depositions,

5    answers to interrogatories, and admissions on file, together with the

6    affidavits, if any, show that there is no genuine issue as to any material fact

7    and that the moving party is entitled to judgment as a matter of law." Fed.

8    Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

9    475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

10         The moving party bears the initial burden of demonstrating the

11   absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477

12   U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is

13   material is determined by looking to the governing substantive law; if the

14   _____

15   its first summary judgment Motion's Reply brief, which was filed on September 5, 2001.  Even

16   assuming arguendo that AOL raised certain issues for the first time in its Reply brief,  Plaintiff

17   cannot claim that he was prejudiced in any way.  First,  Plaintiff had ample opportunity to respond

18   in connection with AOL's second Motion for summary judgment (filed November 26, 2001) and

19   with Plaintiff's own Motion for summary adjudication (filed November 27, 2001).  And second, the

20   Court granted Plaintiff permission to file a supplemental brief specifically in response to AOL's

21

22   September 5, 2001 Reply, and Plaintiff did so, filing its supplemental brief on December 10, 2001.

23   At this point, all the issues before the Court have been fully briefed, and no party can claim  surprise,

24   prejudice, or unfair treatment.  Moreover, if the Court were to reject AOL's Motion for summary

25   judgment on the grounds that certain matters were raised for the first time in its September 5, 2001,

26

27   Reply brief, that would merely delay the inevitable and force the parties to file the same boxes of

28   papers with the Court yet again.

1    fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

2         If the moving party meets its initial burden, the "adverse party may

3    not rest upon the mere allegations or denials of the adverse party's pleading,

4    but the adverse party's response, by affidavits or as otherwise provided in this

5    rule, must set forth specific facts showing that there is a genuine issue for

6    trial." Fed.R.Civ.P. 56(e).  Mere disagreement or the bald assertion that a

7    genuine issue of material fact exists does not preclude the use of summary

8    judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir. 1989).

9         The Court construes all evidence and reasonable inferences drawn

10   therefrom in favor of the non-moving party. *Anderson*, 477 U .S. at 255;

11   *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492-93 (9th Cir. 1995).

16                        IV.  Discussion

18   A. Plaintiff's case against AOL for copyright infringement

19        AOL contends that Plaintiff cannot establish the prima facie elements

20   of his direct, contributory, and vicarious copyright infringement claims

21   against it, and therefore summary adjudication is appropriate.  Plaintiff

22   disputes AOL's contentions and asserts that he is entitled to summary

23   adjudication of his contributory and vicarious copyright infringement

24   claims.

26   *1. Direct copyright infringement*

27        "Plaintiffs must satisfy two requirements to present a prima facie case

28   of direct infringement: (1) they must show ownership of the allegedly

7

1   infringed material and (2) they must demonstrate that the alleged infringers

2   violated at least one exclusive right granted to copyright holders under 17

3   U.S.C. §106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (2001).

4        It is undisputed that Plaintiff owns valid copyrights for most, if not all,

5   of the allegedly infringed works identified in his Complaint.[5]   And if AOL

6   were found to have copied any of Ellison's works then it might have violated,

7   for example, his exclusive rights to reproduction and distribution. *See* 17

8   U.S.C. §106(1), (3).   AOL contends, however, that it has not in any way

9   copied Ellison's works.   In his second amended complaint Plaintiff alleges

10  that AOL made copies of his works on its USENET servers after receiving

11  the USENET messages posted by Robertson, and that one binary file

12  containing a copied work remained on AOL's servers for ten days after

13  Plaintiff's counsel sent the company a Notification of Infringement e-mail.[6]

14

15        [5]AOL claims that Ellison does not own a valid registered copyright for the audiowork "The

16  Voice From the Edge,"and that Ellison only registered his copyright for "Count the Clock That Tells

17  the Time" two months after AOL blocked access to the alt.binaries.e-book site in late April 2000,

18  but makes no similar allegations relating to any of the other works cited by Plaintiff.

19

20        [6]In its Opposition to Ellison's Motion for summary judgment and its Reply brief to its own

21  Motion for summary judgment, AOL for the first time contends that Ellison has produced no

22  evidence indicating that infringing copies of his works were located on AOL's USENET servers.

23  In particular, AOL argues that the consent decree entered into by Ellison and co-Defendant

24  Robertson cannot be asserted against AOL as evidence of Robertson's placing of infringing materials

25  onto the alt.binaries.e-book newsgroup where, per AOL's USENET peer agreements' protocol, they

26  were transferred and copied onto AOL's servers.   Even assuming arguendo that the consent decree

27

28  does not have any preclusive effect as against AOL, it does constitute evidence that a reasonable trier

8

1    In his Opposition to AOL's Motion for summary judgment, however,
2    Ellison does not respond to AOL's argument that there was no direct
3    copyright infringement.  Accordingly, it appears that he has abandoned his
4    direct infringement claim against AOL.  Regardless, AOL's role in the
5    infringement as a passive provider of USENET access to AOL users cannot
6    support direct copyright infringement liability.  *See Religious Technology*
7    *Center v. Netcom On-Line Communications Services, Inc.*, 907 F.Supp. 1361,
8    1372-73 (N.D. Cal. 1995).  In *Netcom*, the court held that the defendant, an
9    internet services provider like AOL, could not be found guilty of direct
10   copyright infringement based on copies of works that were made and stored
11   on its USENET servers.  *See id; accord ALS Scan, Inc. V. Remarq*
12   *Communities, Inc.*, 239 F.3d 619, 622 (4th Cir. 2001);*Costar Group, Inc. v.*
13   *Loopnet, Inc.*, 164 F.Supp.2d 688, 696 (D. Md. 2001).  The *Netcom* Court
14   stated that assigning direct copyright infringement liability to ISPs would be
15   pointless:

16         These parties [the ISPs], who are liable under plaintiff's theory, do no
17         more than operate or implement a system that is essential if Usenet
18         messages are to be widely distributed.  There is no need to construe the
19         [Copyright] Act to make all of these parties infringers.

20   *Id.* at 1369-70.  The court based this decision on its conclusion that "[t]he

21   _____

22   of fact could rely on.  And although AOL labels the consent decree inadmissible hearsay, it is an

23   order entered and signed by the Court, and therefore qualifies as a hearsay exception under, at least,

24   Fed. R. Evid. Rule 803(8).

25

26         In addition,

27   evidence that infringing copies of works (including some of Ellison's works) were, in fact, posted

28   on and downloaded from the alt.binaries.e-book newsgroup.

court does not find workable a theory of direct infringement that would hold the entire Internet liable for activities that cannot reasonably be deterred." *Id.* at 1372. While the *Netcom* court left open the possibility that an ISP with USENET messages on its servers might be guilty of contributory infringement under certain circumstances, it held that direct infringement liability should be limited to those users, like Robertson, who are responsible for the actual copying. *See id.* at 1372-73;

The Court agrees with the analysis of the court in *Netcom.* Accordingly, summary adjudication of Plaintiff's direct copyright infringement claim against AOL is granted.

*2. Contributory copyright infringement*

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be liable as a 'contributory' infringer ... Put differently, liability exists if the defendant engages in personal conduct that encourages or assists the infringement." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (2001) (internal quotations and citations omitted). "The absence of such language in the copyright statute does not preclude the imposition of liability for copyright infringement on certain parties who have not themselves engaged in the infringing activity. For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984).

1 | *(i) Knowledge*

2 |     The knowledge requirement means that the contributory infringer

3 | must "know or have reason to know of direct infringement." *Id.* at 1020

4 | (internal quotations omitted).  Plaintiff argues that AOL actually knew

5 | about the infringing copies of his works on their USENET servers based on

6 | the email that his attorney sent to AOL on April 17, 2000.  But AOL claims

7 | never to have received that e-mail and asserts that it was first put on notice of

8 | infringement when it was served with a copy of Plaintiff's initial complaint.

9 | The Court accepts AOL employees' assurances that they never received the

10 | e-mail,[7] and finds Plaintiff's argument somewhat puzzling given his

11 | professed belief, supported in detail in his briefs, that his attorney's e-mail

12 | was not received because AOL had provided the Copyright Office with an

13 | incorrect e-mail contact address, and his attorney had relied on that address

14 | when trying to contact AOL.  Accordingly, the Court finds that AOL did not

15 | have actual knowledge of the infringement before being served by Ellison.

16 |     On the other hand, Ellison presents substantial evidence suggesting

17 | that AOL should have known about the infringement prior to being served.

18 | First, AOL's failure to receive the April 17, 2000, e-mail is its own fault.

19 | Inexplicably, AOL had changed its contact e-mail address from

20 | "copyright@aol.com" to "aolcopyright@aol.com" in fall 1999, but waited

21 | until April 2000 to notify the Copyright Office of this change.  As a result,

22 | the complaints of individuals such as Ellison's attorney, who obtained

23 | AOL's e-mail address from the Copyright Office and attempted to notify

24 | AOL of infringement occurring on its servers were routed to the defunct

25 |

---

26 |     [7]Plaintiff has provided no evidence that AOL actually did receive the email. To the contrary,

27 | Plaintiff's former counsel states that while she received an acknowledgment of receipt for her April

28 | 17, 2000, email from TCO, no such acknowledgment came from AOL.

1   account.  Nor did AOL make provision for forwarding to the new address e-
2   mails sent to the defunct account.  AOL has declined to explain why it
3   delayed months before notifying the Copyright Office of its change in e-mail
4   addresses.  If AOL could avoid the knowledge requirement through this
5   oversight or deliberate action, then it would encourage other ISPs to remain
6   willfully ignorant in order to avoid contributory copyright infringement
7   liability.  Based upon the record before the Court, a reasonable trier of fact
8   could certainly find that AOL had reason to know that infringing copies of
9   Ellison's works were stored on their Usenet servers.

10          In addition, AOL received further information about the infringement
11   occurring on the USENET newsgroup accessible to AOL users from John J.
12   Miller.  Miller noticed a number of apparently unauthorized copies of
13   various authors' works on the newsgroup and called AOL to report the
14   suspicious activity, although he probably mentioned only works by authors
15   other than Ellison.  Even though it is not clear that Miller's phone call can
16   be fairly said to have put AOL on notice of the infringing activity (he spoke
17   only with low-level customer service representatives, it's not clear whether
18   he expressly mentioned the alt.binaries.e-book newsgroup, and he did not
19   follow up on the customer service representative's advice by sending AOL an
20   e-mail setting forth the details of his complaint), it is another piece of
21   evidence which might lead a reasonable trier of fact to conclude that AOL
22   should have known about the infringement of Ellison's copyrights occurring
23   in its newsgroup.  For example, a reasonable trier of fact might conclude that
24   AOL should have transferred Miller to speak with an employee  with
25   knowledge of AOL's copyright infringement policies instead of directing
26   him to an e-mail address.[8]

27

28

---

[8]It is not clear if Miller was directed by AOL customer service representatives to the correct

12

1

2

3    *(ii) Material contribution to the infringement*

4         AOL correctly points out that it did not induce or encourage

5    Robertson to directly infringe Ellison's copyrights.  Plaintiff, however,

6    maintains that AOL materially contributed to infringement by participating

7    in USENET peering agreements which resulted in making the infringing

8    copies of Ellison's works available to millions of AOL users.  Plaintiff

9    analogizes AOL's conduct to that of Napster, which was held to constitute a

10   material contribution to infringement.  *See Napster*, 239 F.3d at 1022.  The

11   Court of Appeals in *Napster* based its holding on the district court's finding

12   that "[w]ithout the support services defendant provides, Napster users could

13   not find and download the music they want with the ease of which defendant

14   boasts." *Id.*  (quoting *A&M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896,

15   919-920 (N.D. Cal. 2000).  As such, Napster was providing the "'site and

16   facilities' for direct infringement." *Napster*, 239 F.3d at 1022.  By analogy,

17   Plaintiff alleges that AOL provided the site and facilities for direct

18   infringement by storing infringing copies of Ellison's works on its USENET

19   servers and providing its users with access to those copies.

20        In response, AOL contends that its mere provision of USENET access

21   to its users, as a matter of law, is far too attenuated from the actual infringing

22   activity to constitute a material contribution.  In support it points to section

23   512(m) of the DMCA, which provides that an ISP does not have to monitor

24   its service or affirmatively search for infringing activity on its network in

25   order to qualify for any of the limitation-on-liability safe harbors.

26        The Court agrees with the findings of the court in *Netcom* that

27   _____

28   e-mail address or the same defunct address where Ellision's attorney sent her e-mail.

"[p]roviding a service that allows for the automatic distribution of all Usenet postings, infringing and noninfringing" can constitute a material contribution when the ISP knows or should know of infringing activity on its system "yet continues to aid in the accomplishment of Erlich's [the direct infringer's] purpose of publicly distributing the postings." *Netcom*, 907 F.Supp. at 1375. The court noted that "Netcom allows Erlich's infringing messages to remain on its system and be further distributed to other Usenet servers worldwide." *Id.*; *see also Napster*, 239 F.3d at 1021 (approving the *Netcom* Court's conclusion regarding Netcom's potential liability for contributory infringement); 3 NIMMER ON COPYRIGHT §12B.01[A], at 12B-9 n.50 ("Given that Netcom declined to cancel Erlich's messages, if plaintiffs could show that it had knowledge of their infringing character, it would make a strong showing for contributory infringement.").

In *Netcom* the court dealt with a situation in which the ISP had actual knowledge of the presence of infringing material on its USENET servers. Here, by contrast, there is a triable issue of fact as to whether AOL should have known of the infringing material on the alt.binaries.e-books newsgroup based on the e-mail sent to it by Plaintiff's counsel and the Miller phone call. Although there is some difference between an ISP actually knowing of infringement and ignoring requests to remedy the situation and an ISP remaining ignorant of infringement through its own fault and taking no action, the *Netcom* decision cannot be distinguished on that basis. To do so would invite ISPs to remain willfully ignorant of infringement on their servers (through the creation of unchecked notification e-mail addresses and other means), and would frustrate the careful balance struck by Congress when it enacted the DMCA.

In addition, *Netcom* is not legally distinguishable on the basis that AOL had no real connection with Robertson, whereas Netcom played a

significant role in connecting Erlich, the direct infringer, to the Internet.
Although a trier of fact might consider this difference in reaching the
conclusion that AOL did not make a material contribution to Robertson's
underlying infringement, that difference cannot alone transform a triable
issue of fact into a determination suitable for summary adjudication. *Netcom*
analyzed the ISP's behavior after the infringement had already occurred, and
with regard to contributory infringement, the court's central concern was the
ISP's decision to leave the infringing messages on its system even after
receiving the plaintiff's infringement complaint.  Similar concerns provide
the basis for plaintiff's contributory infringement claim against AOL.

Accordingly, the Court finds that Plaintiff has demonstrated a triable
issue of fact as to whether AOL materially contributed to the direct
infringement of Ellison's copyrights by others.

*3. Vicarious copyright infringement*

"In the context of copyright law, vicarious liability extends beyond an
employer/employee relationship to cases in which a defendant 'has the right
and ability to supervise the infringing activity and also has a direct financial
interest in such activities.'" *Napster*, 239 F.3d at 1022 (quoting *Gershwin
Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d. Cir.
1971)). "Unlike contributory infringement, knowledge is not an element of
vicarious liability." *Netcom*, 907 F.Supp. at 1375 (citing to 3 NIMMER ON
COPYRIGHT § 12.04[A][1], at 12-70).

*1. Right and ability to supervise the  infringing activity*

AOL maintains that it did not possess the right or ability to supervise

1  Robertson's infringing acts because of the automated nature of its
2  participation in the USENET system.   Robertson never used the AOL
3  system to upload the infringing copies of Plaintiff's works, and his posting
4  was just one of millions of USENET postings that AOL servers
5  automatically receive from peers each week.

6      Plaintiff, on the other hand, contends that the Ninth Circuit's recent
7  decision in *Napster* defeats AOL's position.  In *Napster*, the Court found that
8  Napster's "ability to block infringers' access to a particular environment for
9  any reason whatsoever is evidence of the right and ability to supervise." *Id.*
10 at 1023.  AOL had the same capacity to block infringers' access to its
11 USENET servers, Plaintiff argues, as demonstrated by AOL's successful
12 blocking of the alt.binaries.e-book newsgroup from access by AOL users
13 upon receiving notice of Plaintiff's lawsuit.  Further support comes from
14 *Netcom*.  In *Netcom*, the court found there was a triable issue of fact as to an
15 ISP's right and ability to control and supervise infringement on its system.
16 The court also stated that whether the ISP's ability to terminate the accounts
17 of infringers and to block access to or delete infringing material "occurred
18 before or after the abusive conduct is not material to whether Netcom can
19 exercise control." *Id.* at 1376.

20     AOL disputes the *Napster* analogy.  The Napster system, AOL argues,
21 was closed and afforded Napster the right and ability to control infringing
22 parties because only Napster members could access and commit
23 infringement on the system.  By contrast, AOL's after-the-fact ability to
24 remove or block access to infringing activities by non-AOL users such as
25 Robertson does not constitute an ability to control or supervise.  Robertson
26 accessed USENET from outside of AOL, and AOL had no ability to
27 effectively control his infringement.

28     AOL also points to the recent decision in *Hendrickson v. eBay* in

16

1   support of its contention that it did not possess the right and ability to
2   control the infringing activity. *See Hendrickson v. eBay*, 165 F.Supp.2d 1082
3   (C.D. Cal. 2001). In *eBay*, the district court held that "the 'right and ability
4   to control' the infringing activity, as the concept is used in the DMCA,
5   cannot simply mean the ability of a service provider to remove or block
6   access to materials posted on its website or stored on its system." *Id.* at 1093.
7   The court reasoned that because the DMCA specifically requires ISPs to
8   remove or block access to infringing materials in order to avail themselves of
9   the limitation on liability found in subsection 512(c), the "right and ability
10  to control" must mean something more than the ability to delete or block
11  access to infringing materials after the fact. *See id.* Otherwise, "a service
12  provider loses immunity under the safe-harbor provision of the DMCA
13  because it engages in acts that are specifically required by the DMCA." *Id.*
14  at 1094.

15      The *eBay* court's analysis somewhat overstates the predicament (ISPs
16  not receiving a financial benefit directly attributable to the infringing
17  activity would not face this "catch-22"), but it does raise an interesting point,
18  namely: ISPs that do receive a financial benefit directly attributable to the
19  infringing activity and that wish to avail themselves of subsection (c)'s safe
20  harbor are required by 512(c)(1)(C) to delete or block access to infringing
21  material. Yet in taking such action they would, in Plaintiff's analysis, be
22  admitting that they have the "right and ability to control" infringing
23  activity, which under 512(c)(1)(B) would prevent them from qualifying for
24  the subsection (c) safe harbor. It is conceivable that Congress intended that
25  ISPs which receive a financial benefit directly attributable to the infringing
26  activity would not, under any circumstances, be able to qualify for the
27  subsection (c) safe harbor. But if that was indeed their intention, it would
28  have been far simpler and much more straightforward to simply say as much.

The Court does not accept that Congress would express its desire to do so by creating a confusing, self-contradictory catch-22 situation that pits 512(c)(1)(B) and 512(c)(1)(C) directly at odds with one another, particularly when there is a much simpler explanation: the DMCA requires more than the mere ability to delete and block access to infringing material after that material has been posted in order for the ISP to be said to have "the right and ability to control such activity."

The DMCA did not simply rewrite copyright law for the on-line world. Rather it crafted a number of safe harbors which insulate ISPs from most liability should they be accused of violating traditional copyright law.[9] And the legislative history expressly states that "new Section 512 does not define what is actionable copyright infringement in the on-line environment ... [t]he rest of the Copyright Act sets those rules." H.R. Rep. 105-551(II), at p. 64 (July 22, 1998). Nonetheless, there is much to be gained from defining and analyzing certain terms and concepts consistently throughout copyright law, including the DMCA. And when Congress chooses to utilize exact phrases that have a specialized legal meaning under copyright law (i.e. "the right and ability to control infringing activity"),[10] and gives those phrases a certain meaning in one context (i.e. under the DMCA, the ability to delete or

---

[9]The DMCA provides that "[t]he failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense." 17 U.S.C. §512(l); *see also* 3 NIMMER ON COPYRIGHT §12B.06[B].

[10]*See* 3 NIMMER ON COPYRIGHT §12B.04[A][2] ("The combination of each of these twin factors of financial benefit and ability to control [found in section 512(c)(1)(B) codifies both elements of vicarious liability").

1  block access to infringing materials after the infringement has occurred is
2  not enough to constitute "the right and ability to control"), Congress's
3  choice provides at least persuasive support in favor of giving that phrase a
4  similar meaning when used elsewhere in copyright law.

5      Moreover, the right and ability to control the infringing behavior in
6  AOL's case was substantially less than that enjoyed by the ISP in *Netcom*.
7  There, the ISP was one of two entities responsible for providing the direct
8  infringer with access to the Internet. *See Netcom*, 907 F.Supp. at 1365-66. As
9  a result, by taking affirmative steps against the other entity involved, the ISP
10 had the ability to target the infringer himself and deny him access to the
11 Internet. By contrast, AOL had no such ability to go after Robertson
12 personally here. Rather, it found itself in the same situation as every other
13 ISP in the world that had entered into peer agreements which included the
14 alt.binaries.e-book newsgroup. It could delete or block users' access to the
15 infringing postings, but it could not do anything to restrict the infringing
16 activity at the root level.

17     The Court holds that AOL's ability to delete or block access to
18 Robertson's postings of infringing material after those postings had already
19 found their way onto AOL's USENET servers was insufficient to constitute
20 "the right and ability to control the infringing activity" as that term is used
21 in the context of vicarious copyright infringement.

22
23

24 *2. Direct financial benefit*

25     Even if AOL had the right and ability to control Robertson's
26 infringing activity, it would not be liable for vicarious copyright
27 infringement because it did not derive a direct financial benefit from that
28 activity. "Financial benefit exists where the availability of infringing

material 'acts as a "draw" for customers.'" *Napster*, 239 F.3d at 1023 (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9ᵗʰ Cir. 1996)).

Ellison maintains that AOL's provision of access to USENET newsgroups does act as a draw for customers. Like e-mail or instant messaging, USENET access is one of the many services AOL provides in order to lure new customers and retain old ones, Ellison urges. According to Plaintiff, AOL's situation is indistinguishable from that in *Napster*, where the Court of Appeals held that "[a]mple evidence supports the district court's finding that Napster's future revenue is directly dependent upon 'increases in userbase.'" *Id.* at 1023.

Plaintiff's argument ignores the requirement that any alleged financial benefit must be direct. AOL did not receive any financial compensation from its peering agreements and participation in USENET. And USENET usage constitutes a very small percentage, 0.25%, of AOL's total member usage; any "draw" to one particular newsgroup, such as alt.binaries.e-book, is minuscule and remote, as the pro rata "draw" of any single newsgroup (AOL carries more than 43,000 total) constitutes approximately 0.00000596% of AOL's total usage. Moreover, the relevant subset of activity is not simply USENET newsgroup usage, but that portion of USENET usage which is related to copyright infringement. By way of example, only ten of AOL's more than 20 million users inquired when AOL blocked all access to alt.binaries.e-book on April 28, 2000.

USENET postings containing infringing copies of copyrighted works cannot be characterized as a significant "draw" for customers. USENET usage constitutes a very small percentage of total AOL usage, and Plaintiff has failed to produce any evidence suggesting that a significant portion of even that minimal usage entails the illegal exchange of files containing copyrighted material. In this way AOL's situation is radically different from

that of Napster, whose service was devoted to the exchange of mp.3 music files which usually contained unauthorized copies of copyrighted material. Making it easier to exchange infringing copies of music files was Napster's main draw:

> And here the evidence establishes that a majority of Napster users use the service to download and upload copyrighted music. This, in fact, should come as no surprise to Napster since that really, it's clear from the evidence in this case and the early records that were divulged in discovery, was the purpose of it.

*A&M Records, Inc. v. Napster, Inc.*, 2000 WL 1009483, at *1 (N.D. Cal. July 26, 2000) (transcript of the proceedings). By contrast, only a tiny fraction of AOL usage has anything to do with USENET, and only a substantially smaller subset of that usage appears to have anything to do with infringing copyrights.

*Fonovisa* presents another case in which courts have required that the sale or distribution of infringing materials must be a significant draw to customers in order for vicarious copyright liability to apply. In *Fonovisa*, the defendant operated a swap meet at which third-party vendors routinely sold counterfeit recordings that infringed on the plaintiff's copyrights. *Id.* at 260. For example, a single 1991 Sheriff's department raid had netted more than 38,000 pirated recordings. "The facts alleged by Fonovisa ... reflect that the defendants reap substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices." *Id.* at 263. "In short, in *Fonovisa*, a symbiotic relationship existed between the infringing vendors and the landlord." *Adobe Systems Incorporated v. Canus Productions, Inc.*, 173 F.Supp.2d 1044 (C.D. Cal. 2001) (discussing

1 | *Fonovisa*).[11]

2 | By contrast, the record before the Court demonstrates that USENET

3 | usage related to copyright infringement constitutes a minuscule portion of

4 | AOL usage.  The financial benefit accruing to AOL from such infringing

5 | usage, if any benefit exists at all, is too indirect and constitutes far too small a

6 | "draw" to fairly support the imposition of vicarious copyright liability on

7 | AOL.  Moreover, as with the discussion of AOL's "right and ability to

8 | control,", the DMCA provides at least persuasive support for interpreting

9 | "direct financial benefit" to require something more than the indirect,

10 | insignificant financial benefits that may have accrued to AOL as a result of

11 | copyright infringement on its USENET servers.  The legislative history of

12 | the DMCA provides:

13 | In determining whether the financial benefit criterion [of section

14 | _____

15 | [11]In *Adobe*, the district court reasoned that although some of the language in *Fonovisa* is quite

16 | broad, the Ninth Circuit had implicitly recognized that vicarious copyright liability was only

17 | appropriate where the infringing activity was a *substantial* draw, i.e. " substantial numbers of

18 | customers are drawn to a venue with the explicit purpose of [obtaining] counterfeit goods." *Adobe,*

19 | 

20 | 173 F.Supp.2d at 1050.  The *Adobe* Court noted that unless the counterfeit goods constituted "the

21 | main customer 'draw' to the venue, *Fonovisa* would provide essentially for the limitless expansion

22 | of vicarious liability into spheres wholly unintended by the court." *Id.* at 1051.  While the provision

23 | of unauthorized copies of copyrighted material need not necessarily be *the main* customer draw, the

24 | infringing activity must be at least a *substantial* draw.  As the *Adobe* decision points out, to hold

25 | 

26 | otherwise would provide essentially for the limitless expansion of vicarious liability.  For ISPs, the

27 | vicarious copyright infringement doctrine might start to resemble strict liability for any material that

28 | somehow finds its way onto the ISP's servers.

1    512(c)(1)(B)] is satisfied, courts should take a common-sense, fact-

2    based approach, not a formalistic one.  In general, a service provider

3    conducting a legitimate business would not be considered to receive a

4    'financial benefit directly attributable to the infringing activity' where

5    the infringer makes the same kind of payment as non-infringing users

6    of the provider's service.

7  H.R. Rep. 105-51(II), at p. 54 (July 22, 1998). Accordingly, summary

8  adjudication for AOL of Plaintiff's claim for vicarious copyright

9  infringement is granted.

10

11

12

13

14

15

16  ## B. DMCA Limitations on Liability

17      AOL claims to qualify for two of the DMCA's "safe-harbor"

18  provisions, subsection (a), Transitory digital network communications, and

19  subsection (c), Information residing on systems or networks at direction of

20  users. *See* 17 U.S.C. §512(a), (c).   These safe harbors do not confer absolute

21  immunity upon ISPs, but do drastically limit their potential liability based

22  on specific functions they perform (e.g. user-directed information storage).

23  *See generally* 17 U.S.C. §512.  A party satisfying the requirements for one of

24  the safe harbors cannot be liable for monetary relief, or, with the exception of

25  the rather narrow relief available under subsection (j), for injunctive or other

26  equitable relief for copyright infringement. *See id.*

27

28

*1. Section 512(i)*

In order to avail itself of any of section 512's limitation-on- liability safe harbors, AOL must also satisfy the two requirements laid out in section 512(i). Section 512(i) provides that all safe-harbor provisions established by the DMCA shall apply to a service provider only if the service provider:

> (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and
>
> (B) accommodates and does not interfere with standard technical measures.

17 U.S.C. §512(i)(1).

Furthermore, in order for an ISP to comply with subsection (i) and avail itself of one of the DMCA's safe harbors, the ISP must have adopted, reasonably implemented, and notified its members of the repeat infringer termination policy at the time the allegedly infringing activity occurred. Doing so after the infringing activity has already occurred is insufficient if the ISP seeks a limitation of liability in connection with that infringing activity. As explained by the district court in *Napster*, to hold otherwise would be defeat the whole purpose of subsection (i):

> Napster attempts to refute plaintiffs' argument by noting that subsection (i) does not specify when the copyright compliance policy must be in place. Although this characterization of subsection (i) is factually accurate, it defies the logic of making formal notification to users or subscribers a prerequisite to exemption from monetary liability. The fact that Napster developed and notified its users of a formal policy *after* the onset of this action should not moot plaintiffs'

1   claim to monetary relief for past harms.

2   *Napster*, 2000 WL 573136 at * 9 (original emphasis).

3   On its face, subsection (i) is only concerned with repeat-infringer

4   termination policies, and not with copyright infringement in general.

5   Nonetheless, Plaintiff urges that any reasonable policy whose goal is to put

6   repeat infringers on notice that they face possible termination must

7   necessarily include some procedures for actually identifying such individuals

8   in the first place, such as a mechanism whereby the public can notify an ISP

9   of copyright infringement occurring on its system.   A termination policy

10   could not be considered "reasonably implemented" if the ISP remained

11   willfully ignorant of users on its system who infringe copyrights repeatedly.

12   Although the text of section 512(i) could conceivably support such an

13   interpretation, the legislative history demonstrates that Congress's intent

14   was far more limited regarding subsection (i)[12]:

15   the Committee does not intend this provision to undermine the

16   principles of new subsection (l)[13] or the knowledge standard of new

17   subsection (c) by suggesting that a provider *must investigate possible*

18   *infringements, monitor its service, or make difficult judgments as to whether*

19   ───────────────────────

20   [12]The House Report was analyzing a version of the DMCA that was slightly different from

21   the version finally enacted by Congress and signed by President Clinton in late 1998.  Accordingly,

22   what is now subsection (i) was then subsection (h).  However, subsection (i) is not substantively

23   different from subsection (h), and both contain the same requirement that ISPs adopt, implement,

24   and inform subscribers of a termination policy for repeat infringers.  Therefore, the legislative history

25   analyzing subsection (h) is equally relevant to subsection (i).

26   

27   [13]In the version of the DMCA actually enacted,  subsection (l)'s equivalent  is now found at

28   subsection (m).

1      *conduct is or is not infringing.*  However, those who repeatedly or

2      flagrantly abuse their access to the Internet through disrespect for the

3      intellectual property rights of others should know that there is a

4      realistic threat of losing that access.

5 H.R. Rep. 105-551(II), at p. 61 (July 22, 1998) (emphasis added); *see also*

6 S.Rep. 105-190, at p. 51-52 (May 11, 1998) (providing *verbatim* the same

7 explanation of subsection(i)).  In the face of such clear guidance from the

8 legislative history of the DMCA, subsection (i) cannot be interpreted to

9 require ISPs to take affirmative steps to investigate potential infringement

10 and set up notification procedures in an attempt to identify the responsible

11 individuals.   Accordingly, many of Plaintiff's argument regarding

12 subsection (i) are irrelevant to determining whether AOL had reasonably

13 implemented a policy for termination of repeat infringers.[14]

14      It is undisputed that AOL satisfies prong (B) based on its

15 accommodation and non-interference with standard technical measures.

16 And AOL presents evidence to support the conclusion that is has also met

17 the requirements of prong (A).  AOL's Terms of Service, to which every

18 AOL member must agree before becoming a member, includes a notice that

19 AOL members may not make unauthorized copies of content protected by

20 copyrights, trademarks, or any other intellectual property rights.  They also

21 notify members that their AOL accounts could be terminated for making

22 such unauthorized copies.

23      Plaintiff contends, however, that AOL cannot satisfy prong (A) of

24 subsection 512(i)(1) because although the ISP has presented substantial

25 evidence of compliance, most of that evidence comes from March 2001,

26 _____

27     [14]These arguments are, however, relevant to determining whether AOL complied with the

28 requirements of subsection (c).

1  nearly a year after the infringing conduct occurred.  AOL's percipient

2  witness, Elizabeth Compton, testified that AOL's procedures for notifying its

3  users that their access could be terminated if they were to infringe others',

4  copyrights has not changed substantively since April 2000.  However,

5  Plaintiff challenges the credibility and competency of Ms. Compton, whose

6  grasp of the technical side of AOL's copyright infringement procedures was

7  decidedly less than expert.

8          In addition, Plaintiff notes that although AOL claims to have

9  complied with subsection (i) and adopted and reasonably implemented

10  polices aimed at terminating repeat infringers, Compton testified that no

11  individual has ever been terminated for being a repeat infringer.   Given the

12  millions of AOL users, Plaintiff argues, this lack of even a single termination

13  for repeat infringement is evidence that AOL has failed to fulfill its

14  obligation to reasonably implement its subsection(i) termination policy.

15  Moreover, Compton testified at her deposition that at the time of the

16  infringement, AOL had not precisely defined how many times a user had to

17  be guilty of infringement before that user could be classified as a "repeat

18  infringer."  Plaintiff claims this is further evidence that AOL had failed to

19  comply with the reasonable-implementation requirement of subsection (i).

20          As noted above in the discussion of the legislative history of the

21  DMCA, however, subsection (i) does not require AOL to actually terminate

22  repeat infringers, or even to investigate infringement in order to determine if

23  AOL users are behind it.[15]  That is the province of subsection (c), which

24

25  _____

26          [15]As such, the "realistic threat of losing [Internet] access" that Congress wishes ISPs to

27  impress upon would-be infringers remains just that -- a mere threat -- unless the ISP decides to

28  implement procedures aimed at identifying, investigating, and remedying infringement in hopes of

27

1  provides detailed requirements related to notification of infringement and

2  the ISPs' responsibility to investigate and, in some instances, delete or block

3  access to infringing material on their systems.  Subsection (i) only requires

4  AOL to put its users on notice that they face a realistic threat of having their

5  Internet access terminated if they repeatedly violate intellectual property

6  rights.

7          Plaintiff has attacked the credibility and competence of Elizabeth

8  Compton, and in particular challenges her assertion that the AOL's

9  procedures for compliance with subsection (i) have not changed

10  substantively since April 2000.  But most of Plaintiff's "attacks" only

11  demonstrate that Ms. Compton did not understand the technical means by

12  which access to infringing material on AOL's servers may be blocked or by

13  which an AOL user's Internet access could be terminated.  While such

14  shortcomings might be relevant when weighing her testimony regarding

15  AOL's compliance with subsection (c), they are not relevant when

16  considering the much less stringent (and less technical) requirements of

17  subsection (i).  And although Plaintiff disputes Compton's claim that AOL's

18  notification policy has not changed, he has not produced any evidence to the

19  contrary.  "When a motion for summary judgment is made and supported as

20  _____

21  meeting the requirements of subsection (c)'s safe harbor.  Such an arrangement makes a certain

22  amount of sense.  If subsection (i) obligated ISPs to affirmatively seek out information regarding

23  infringement and then investigate, eradicate, and punish infringement on their networks, then most

24  if not all of the notice and takedown requirements of the subsection (c) safe harbor would be

25  indirectly imported and applied to subsections (a) and (b) as well.  This would upset the carefully

26  balanced, "separate function - separate safe harbor - separate requirements" architecture of the

27

28  DMCA.

28

1  provided in this rule, an adverse party may not rest upon the mere
2  allegations or denials of the adverse party's pleading, but the adverse party's
3  response, by affidavits or as otherwise provided in this rule, must set forth
4  specific facts showing that there is a genuine issue for trial." Fed. R. Civ.
5  Proc. 56(e).

6      Accordingly, the Court holds that AOL had satisfied the requirements
7  of 17 U.S.C. § 512(i) at the time of the alleged infringement of Ellison's
8  copyrights.

9
10
11
12  *2. Section 512's limitations on liability (a) through (d)*

13      Section 512(n) explicitly provides that each of the four limitation-on-
14  liability safe harbors found in subsections (a) through (d) "describe separate
15  and distinct functions for purposes of applying this section." *Id.* As a result,
16  "[w]hether a service provider qualifies for the limitation of liability in any
17  one of the subsections shall be based solely on the criteria in that subsection,
18  and shall not affect a determination of whether the service provider qualifies
19  for the limitations on liability under any other such subsection." *Id.* The
20  DMCA's legislative history provides the following instructional example:

21      Section 512's limitations on liability are based on functions, and each
22      limitation is intended to describe a separate and distinct function.
23      Consider, for example, a service provider that provides a hyperlink to a
24      site containing infringing material which it then caches on its system
25      in order to facilitate access to it by its users.  This service provider is
26      engaging in at least three functions that may be subject to the
27      limitation on liability: transitory digital network communications
28      under subsection (a), system caching under subsection (b), and

1     information locating tools under subsection (d).

2 H.R. Rep. 105-551(II), at p. 65 (July 22, 1998).  In this example, if the service

3 provider met the threshold requirements of subsection (i), "then for its acts

4 of system caching it is eligible for that limitation on liability with

5 corresponding narrow injunctive relief.  But if the same company is

6 committing an infringement by using information locating tools to link its

7 users to infringing material, then its fulfillment of the requirements to claim

8 the system caching liability limitation does not affect whether it qualifies for

9 the liability limitation for information location tools." 3 NIMMER ON

10 COPYRIGHT §12B.06[A], at 12B-53, 54.

11     Although AOL performs many Internet-service-provider-related

12 functions, Plaintiff's claims against AOL are based solely on its storage of

13 USENET messages on its servers and provision of access to those USENET

14 messages to AOL users and others accessing the AOL system from outside.

15     AOL claims that it is eligible under both subsections (a) and (c) for a

16 limitation on liability regarding Plaintiff's claims against it.

17

18

19

20 *3. Subsection (a)'s limitation on liability*

21     AOL contends that it meets all the criteria for the limitation-on-

22 liability safe harbor found in subsection (a), which provides:

23     (a) Transitory digital network communications. – A service provider

24     shall not be liable for monetary relief, or, except as provided in

25     subsection (j), for injunctive or other equitable relief, for the

26     infringement of copyright by reason of the provider's transmitting,

27     routing, or providing connections for, material through a system or

28     network controlled or operated by or for the service provider, or by

reason of the intermediate and transient storage of that material in the
course of transmitting, routing, or providing connections, if –

(1) the transmission of the material was initiated by or at the direction
of a person other than the service provider;

(2) the transmission, routing, provision of connections, or storage is
carried out through an automatic technical process without selection of
the material by the service provider;

(3) the service provider does not select the recipients of the material
except as an automatic response to the request of another person;

(4) no copy of the material made by the service provider in the course
of such intermediate or transient storage is maintained on the system
or network in a manner ordinarily accessible to anyone other than
anticipated recipients, and no such copy is maintained on the system
or network in a manner ordinarily accessible to such anticipated
recipients for a longer period than is reasonably necessary for the
transmission, routing, or provision of connections; and

(5) the material is transmitted through the system without
modification of its content.

Subsection (a) does not require ISPs to remove or block access to infringing
materials upon receiving notification of infringement, as is the case with
subsections (c) and (d).

On the other hand, the term "service provider" is defined more
restrictively for subsection (a) than it is throughout the rest of section 512.
*See* 17 U.S.C. §512(k). "As used in subsection (a), the term 'service provider'
means an entity offering the transmission, routing, or providing of
connections for digital online communication, between or among points
specified by a user, of material of the user's choosing, without modification

1  to the content of the material as sent or received."[16]  *Id.*  In effect, this

2  definition merely restates a number of the requirements that are already set

3  forth in subsection (a).  Therefore, Plaintiff's contention that AOL does not

4  meet the restrictive definition of a "service provider" as subsection (k)

5  defines that term for subsection (a) does not need to be addressed separately

6  from Plaintiff's arguments that AOL cannot satisfy the requirements of

7  subsection (a).  The Court addresses each of those requirements in turn.

8

9  Plaintiff argues that AOL's USENET servers do not engage in

10  "intermediate and transient storage" of USENET messages such as the one

11  posted by Robertson.  Instead, AOL stores USENET messages containing

12  binary files on its servers for up to fourteen days."[17]  AOL, however, claims

13  that the USENET message copies are "intermediate."  AOL's role is as an

14  intermediary between the original USENET user who posts a message, such

15  as Robertson, and the recipient USENET users who later choose to view the

16  message.

17  By itself, the term "intermediate and transient storage" is rather

18  _____

19  [16] By contrast, for the purposes of the rest of section 512, the term 'service provider' is

20  defined more broadly as "a provider of online services or network access, or the operator of facilities

21  therefor."  17 U.S.C. §512(k)(2)

22  [17]Plaintiff has presented evidence suggesting that despite AOL's 14-day storage protocol,

23  certain USENET messages containing binary files might have resided on AOL's servers for up to

24  thirty-one days, but he makes no claim that such was the case with the messages containing

25  infringing copies of his works (nor with any other infringing messages in the alt.binaries.e-book

26  newsgroup).  When deciding whether AOL qualifies for subsection (a)'s limitations on liability, the

27  Court considers only the allegedly infringing postings.

28

1   ambiguous.  And it is unclear from reading the DMCA  whether AOL's

2   storage of USENET messages containing binary files on its servers for

3   fourteen days in order to make those messages accessible to AOL users

4   constitutes "intermediate and transient storage."  Certain functions such as

5   the provision of e-mail service or Internet connectivity clearly fall under the

6   purview of subsection (a); other functions such as hosting a web site or

7   chatroom fall under the scope of subsection (c).  The question presented by

8   this case is which subsection applies to the function performed by AOL

9   when it stores USENET messages in order to provide USENET access to

10  users. Faced with the ambiguous language in the statute itself, the Court

11  looks to the DMCA's legislative history for guidance in interpretation.  The

12  only real guidance is provided in the House Judiciary Committee Report.

13  *See* H.R. Rep. 105-551 (May 22, 1998).

14         The Court is mindful that reliance on the Report issued by the House

15  Judiciary Committee, "the body that traditionally vets copyright

16  legislation",[18] is somewhat problematic.  The Report's section-by-section

17  analysis was based on an early version of the DMCA which differs in a

18  number of ways from the final version that was eventually enacted by

19  Congress.  And the Court recognizes that "even if the language of a given

20  feature [in the earlier version of the bill] does ultimately follow through to

21  the Digital Millennium Copyright Act, the meaning may be different in the

22  context of a law containing vastly more provisions than the [earlier

23  version]." 3 NIMMER ON COPYRIGHT §12B.01[C], at 12B-19.

24  Nonetheless, the Court believes that the analysis in the House Judiciary

25  Committee Report provides the clearest guidance concerning Congress'

26  intent.

27

28         [18] 3 NIMMER ON COPYRIGHT §12B.01[C], at 12B-18.

At the time the first House Report was issued, the Committee was considering a version of the bill that differs in many ways from the final version that was eventually enacted into law as the DMCA. However, the previous version's language regarding "the intermediate storage and transmission of material" is very similar to the "intermediate and transient storage of that material" language that is found in the final version of the DMCA. Moreover, the portion of subsection (a) in the previous version, having to do with maintaining material on the system, is also extremely similar to the corresponding language found in the enacted version of the DMCA at 512(a)(4).[19] Although other aspects of the bill changed substantially before the final version was enacted into law, the language dealing with the "intermediate storage" did not. Accordingly, the section-by-section analysis found in the First House Report is relevant to

---

[19]The version considered by the House Judiciary Committee, at 512(a)(C) states that "(C) no copy of the material thereby made by the provider is maintained on the provider's system or network in a manner ordinarily accessible to anyone other than the recipients anticipated by the person who initiated the transmission, and no such copy is maintained on the system or network in a manner ordinarily accessible to such recipients for a longer period than is reasonably necessary for the transmission."

The final version of the DMCA provides, at subsection 512(a)(4), that "(4) no copy of the material made by the service provider in the course of such intermediate and transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections."

1 | interpreting whether AOL's storage of USENET messages in order to
2 | provide USENET access to AOL users  constitutes (1) "intermediate and
3 | transient storage" of (2) copies that are not "maintained on the system or
4 | network ... for a longer period than is reasonably necessary for the
5 | transmission, routing, or provision of connections."  17 U.S.C. §512(a),
6 | (a)(4).

7 |   The First House Report answers both of those questions with a
8 | resounding yes:

9 |   The exempted storage and transmissions are those carried out through
10 |   an automatic technological process that is indiscriminate - i.e., the
11 |   provider takes no part in the selection of the particular material
12 |   transmitted - where the copies are retained no longer than necessary
13 |   for the purpose of carrying out the transmission.  This conduct would
14 |   ordinarily include forwarding of customers' Usenet postings to other
15 |   Internet sites in accordance with configuration settings that apply to
16 |   all such postings...

17 |   This exemption codifies the result of Religious Technology Center v.
18 |   Netcom On-line Communications Services, Inc., 907 F.Supp. 1361
19 |   (N.D. Cal. 1995) ("Netcom"), with respect to liability of providers for
20 |   direct copyright infrigement.[20]  See id. at 1368-70.  In Netcom the

---

[20]Any argument that this codification of *Netcom*'s facts regarding intermediate storage was only meant to apply to direct infringement, and not to vicarious or contributory infringement, is forestalled by subsection (2) of the version of the bill then under consideration by the Judiciary Committee.  For subsection (2) makes it clear that the same limitations on liability that apply under subsection (1) for direct infringement also apply to "contributory infringement or vicarious liability, based solely on conduct described in paragraph (1)." *See* H.R. Rep. 105-551(I), at p. 8.  In effect,

1   court held that a provider is not liable for direct infringement where it

2   takes no 'affirmative action that [directly results] in copying ... works

3   other than by installing and maintaining a system whereby software

4   automatically forwards messages received from subscribers ... and

5   temporarily stores copies on its system." *By referring to temporary storage*

6   *of copies, Netcom recognizes implicitly that intermediate copies may be*

7   *retained without liability for only a limited period of time. The requirement in*

8   *512(a)(1) that "no copy be maintained on the system or network ... for a*

9   *longer period than reasonably necessary for the transmission" is drawn from*

10  *the facts of the Netcom case, and is intended to codify this implicit limitation*

11  *in the Netcom holding.*

12  H.R. Rep. 105-551(I), at p. 24.  (emphasis added).

13       In *Netcom,*  infringing USENET postings were stored on Netcom's

14  _____

15  subsection (2) provided that regardless of a plaintiff's theory of infringement - direct, contributory,

16  or vicarious - it was the underlying conduct of the ISP, i.e. the function it was performing, that is

17  central to determining whether the ISP qualifies for a limitation on liability.  The section-by-section

18  analysis said this of subsection (2): "Paragraph 512(a)(2) exempts a provider from any type of

19  monetary relief under theories of contributory infringement or vicarious liability for the same

20  activities for which providers are exempt from liability for direct infringement under paragraph

21  512(a)(1). This provision extends the *Netcom* holding with respect to direct infringement to remove

22  monetary exposure for such limited activities for claims arising under doctrines of secondary

23  liability.  Taken together, paragraphs (1) and (2) mean that providers will never be liable for any

24  monetary damages for this type of transmission of material at the request of third parties or for

25  intermediate storage of such material in the course of the transmission." H. R. Rep. 105-551(I), at

26  p. 25.

servers for up to <u>eleven days</u>, during which those postings were accessible to Netcom users. *See Netcom*, 907 F.Supp. at 1368. In AOL's case, messages containing binary files, such as the message posted by Robertson, were stored on AOL's servers for up to <u>fourteen days</u>. While "intermediate copies may be retained without liability for only a limited period of time," the three-day difference between AOL's USENET storage and that of Netcom is insufficient to distinguish the two cases.

Accordingly, the Court finds that AOL's storage of Robertson's posts on its USENET servers constitutes "intermediate and transient storage" that was not "maintained on the system or network ... for a longer period than is reasonably necessary for the transmission, routing, or provision of connections."

While this issue presented the central disagreement regarding AOL's qualifications for subsection(a)'s limitation-on- liability safe harbor, the parties also dispute whether AOL satisfies other requirements set forth in subsection (a).

*(1) the transmission of the material was initiated by or at the direction of a person other than the service provider*

It is clear that the transmission of Robertson's newsgroup message was not initiated by or at the direction of AOL. In fact, Plaintiff does not appear to even dispute this conclusion. (Plaintiff's Separate Statement of Genuine Issues at II(3), 6/4/2001 Motion for summary judgment).

*(2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider*

37

1    Plaintiff claims that AOL selects the material that is transmitted,

2 routed, and stored in its USENET groups.  Namely, AOL decides which

3 newsgroups its subscribers may access through its newsgroup service.

4    AOL did not select the individual postings on the alt.binaries.e-book

5 newsgroup, let alone the handful of infringing Robertson posts.  512(a)(2) is

6 concerned with "selection of the material," meaning the allegedly infringing

7 material, not material generally.  By focusing on AOL's decision to not carry

8 every single newsgroup conceivably available, Plaintiff is attempting to slip

9 from the specific to the general, despite the fact that subsection (a) is

10 concerned with the specific material giving rise to the Plaintiff's claims

11 against AOL.

12    Even if Plaintiff were right, and AOL's treatment of USENET

13 messages in general was the relevant inquiry, AOL's failure to carry every

14 newsgroup available would not disqualify it from subsection (a)(2).

15 Although this would present a closer call, the Court thinks that an ISP

16 would need to take a greater editorial role than merely choosing not to carry

17 certain newsgroups.  Although the legislative history states that "subsection

18 (a)(2) means the editorial function of determining what material to send, or

19 the specific sources of material to place on-line," H.R. Rep. 105-551(II) (July

20 22, 1998), the better interpretation of (a)(2) is that the ISP would have to

21 choose specific postings, or perhaps block messages sent by users expressing

22 opinions with which the ISP disagrees.  If an ISP forfeits its ability to qualify

23 for subsection (a)'s safe harbor by deciding not to carry every USENET

24 newsgroup or web site possible, then the DMCA would have the odd effect of

25 punishing ISPs that choose not to carry, for example, newsgroups devoted to

26 child pornography and prostitution, or web sites devoted to ritual torture.[21]

27

28    [21]ISPs would also be punished for making the economic decision not to provide access to

38

1   Given the concern Congress has shown in other bills for children's access to

2   obscene materials on-line, it would be absurd to conclude that Congress

3   intended such a result with regard to the DMCA.

4

5   *(3) the service provider does not select the recipients of the material except as an*

6   *automatic response to the request of another person*

7         Plaintiff argues that AOL selects the recipients of the material because

8   it chooses to engage in USENET peering agreements with some entities but

9   not with others.   First, as with (a)(2), Plaintiff's argument fails because

10  section 512(a) is concerned with AOL's selection of the recipients of the

11  material in question in this lawsuit, i.e. Robertson's infringing posts.  It is

12  clear that AOL did not select certain recipients for that material.  Rather, it

13  was accessible to any AOL user through AOL's USENET newsgroup server.

14  Second, and also analogous to (a)(2), the better interpretation is that AOL

15  would have to direct material to certain recipients (e.g. all AOL members

16  whose names start with "G") but not others.  If AOL were to lose its ability

17  to qualify for subsection(a)'s safe harbor because it has peer agreements with

18  some entities but not with others, then the DMCA would appear to place an

19  affirmative obligation on AOL to enter into peering arrangements with every

20  conceivable peering entity in the world.  This could not have been what

21  Congress' intent.

22

23  *(5) the material is transmitted through the system without modification of its content*

24        Plaintiff does not seriously contest that AOL does not modify the

25  content of newsgroup messages stored on its servers and transmitted through

26  its system.  Moreover, Plaintiff has presented no evidence that AOL in any

27  _____

28  newsgroups and other sites for which there was no user demand.

1    way modified the content of Robertson's infringing posts.

2

3        The Court hereby finds that AOL qualifies for the limitation-on-

4    liability provided under subsection 512(a).[22]

5

6

7                              **V. Conclusion**

8        The Court hereby **GRANTS** Defendant AOL's Motion for summary

9    judgment.  This Order disposes of Motions #109, 152, and 156 on the

10   Court's Docket for this Matter.

11

12       Dated: March 12, 2002.

13

14                                    _____
                                      FLORENCE-MARIE COOPER, Judge
15                                    UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25

26   _____

27       [22]Accordingly, we need not reach the arguments presented by the parties regarding AOL's

28   satisfaction of the requirements of subsection 512(c).

                                          40